| | |
|---|---|
| **KERRY HIRTH, HENNINGS JOINT TRUST, VAN DIEST FAMILY LLC, CHARLES CITY AREA DEVELOPMENT CORPORATION, RLIJ, FREE SOIL FOUNDATION, KING INTERVENORS**<br>　　　**PETITIONERS,**<br><br>　　**V.**<br><br>**IOWA UTILITIES COMMISSION, SARAH MARTZ, ERIK HELLAND, AND JOSHUA BYRNES (not personally but in their capacity as a commission of the Iowa Utilities Commission), SUMMIT CARBON SOLUTIONS, LLC,**<br>　　　**RESPONDENT.** | **CASE NO. 6:24-cv-2046**<br><br>**PETITION FOR JUDICIAL REVIEW** |

COME NOW Petitioners, Kerry Hirth, Carole Hennings, Van Diest Family LLC, RLIJ, Charles City Area Development Corporation, Free Soil Foundation, King Intervenors and asserts the following claims against the Defendants, Iowa Utilities Commission Members (IUC) (Sarah Martz, Erik Helland, and Joshua Byrnes) and Summit Carbon Solutions LLC, (Summit) and state the following.:

1.　　Kerry Hirth, Carole Hennings, and Van Diest LLC are all Petitioners whose property will be encumbered by the Summit Carbon pipeline.

2.　　The Charles City Area Development Corporation is an accredited economic development organization for Charles City, Iowa, and greater Floyd County, Iowa.

3.　　The RLIJ is an unincorporated association of Members of the Iowa General Assembly, who, on behalf of themselves, their constituents, and all citizens of the State of Iowa,

are concerned with the protection of Iowa's environment, protection of the rights and liberties granted Iowans under the United States and Iowa Constitutions, and protection of the safety and well-being of Iowans generally.[1]

4.      Free Soil Foundation is a 501(C.3) corporation formed to educate the public and defend Constitutional principles, in particular Fifth Amendment property rights, against unconstitutional eminent domain abuse.

5.      King Intervenors are members of the public who were denied due process of law during this process.

6.      Defendant Iowa Utilities Commission is a commission created by Iowa law. The IUC regulates the rates and services of certain utilities and specific utility infrastructure related to pipelines and electric transmission lines.

7.      Defendants Commissioners Sarah Martz, Erik Helland, and Joshua Byrnes (collectively "the Board members") are members of the Iowa Utilities Commission created by Iowa Code § 474.9 and Chapter 476 of the Iowa Code. The Iowa Utilities Commission is located in Des Moines, Iowa. Each individual is named as a defendant in his or her official capacity and not as an individual.

8.      Defendant Summit Carbon Solutions, LLC ("Summit"), Summit is a Delaware

---

[1] Senator Kevin Alons, Senator Rocky De Witt, Senator Lynn Evans, Senator Jesse Green, Senator Dennis Guth, Senator Mark Lofgren, Senator David Rowley, Senator Sandy Salmon, Senator Jason Schultz, Senator Jeff Taylor, Senator Cherielynn Westrich, Representative Eddie Andrews, Representative Brooke Boden, Representative Steven Bradley, Representative Ken Carlson, Representative Mark Cisneros, Representative Zach Dieken, Representative Dean Fisher, Representative Dan Gehlbach, Representative Thomas Gerhold, Representative Cindy Golding, Representative Helena Hayes, Representative Bob Henderson, Representative Steven Holt, Representative Heather Hora, Representative Thomas Jeneary, Representative Bobby Kaufman, Representative Joshua Meggers, Representative Anne Osmundson, Representative Bradley Sherman, Representative Jeff Shipley, Representative Luana Stoltenberg, Representative Henry Stone, Representative Mark Thompson, Representative Charles Thomson, Representative Skyler Wheeler and Representative Derek Wulf.

limited liability company with its principal place of business in Iowa.

9.    Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under and seeks a declaration of the parties' rights under Federal Law, including but not limited to the Supremacy Clause, U.S. Const art. VI., c1. 2, the Contract Clause, U.S. Const art. I, cl. 10, Commerce Clause, U.S. Const Arte I, Section 8, Clause 3, Eminent Domain Clause U.S. Const. amend. V. b

10.    The Court also has jurisdiction under 28 U.S.C. § 1343 because the Defendants have, under the color of state law, deprived plaintiffs and plaintiff constituents of property without due process of law and taken without just compensation.

11.    This Court has supplemental jurisdiction to consider the pendent state law claims under 28 U.S.C. § 1367(a).

12.    The Court has the authority to grant the injunctive relief requested under the All Writs Act, 28 U.S.C. § 1651.

13.    The Court has the authority to enter the declaratory judgment relief requested under 28 U.S.C. §§ 2201-2202.

14.    This Court is further authorized to issue a declaratory judgment under 28 U.S.C. §§ 2201-2202 and Fed R.Civ.P. 57 and 65.

15.    RLIJ and Free Soil Foundation has an associational standing to bring this case forward on behalf of their members.

**Procedural History**

16.    On January 28, 2022, Summit Carbon Solutions LLC filed its petition to construct, operate, and maintain 688.01 miles of supercritical $CO_2$ pipeline[2] in Iowa.

---

[2] "Supercritical carbon dioxide is a fluid state of carbon dioxide where it is held at or above its critical temperature and critical pressure.  Carbon dioxide usually behaves as a gas in air at standard temperature and pressure (STP), or as a solid called dry ice when frozen. " _US Department of Energy._

17.     From August 22 through November 8, 2023, hearings were held in Iowa.

18.     Bob Van Diest testified on behalf of Van Diest LLC., on 9/26/2023. However, his testimony was limited in time and scope, disregarded by the board, and thus he was denied due process.

19.     Petitioner Kerry Hirth is a landowner whose land will be affected by the pipeline. She was additionally denied due process due to the IUC's constant changing of speaker rules and policies and subsequent issues with being denied the ability to testify.

20.     Petitioner Carole Hennings, through Former Congressman Steve King, attempted to testify on her behalf at the November 6th hearing. She was not able to testify due to recent heart surgery. She had notified the IUC of this, and they replied, "Okay." When Mr. King arrived, personnel[3]checked him in and gave him a "witness" tag to wear to be recognized for his testimony; however, when it was his time to testify on Mrs. Henning's behalf, the chairman allowed no response. "Okay," plus the muzzling of a recognized witness destroyed Mrs. Henning's right to be heard; the record, big as it is, is necessarily incomplete when material witnesses are prohibited from testifying.

21.     On October 26, 2022, CCADC submitted a letter to the IUC requesting that an alternative route be taken one mile west of the proposed route. This alternative route would be next to another already-developed industrial park. This industrial park is located far enough away from Charles City that there are fewer risks to the general public, unlike the proposed route, which goes by the Cedar Valley Transportation Center, two nursing homes, a grocery store, one

---

[3] It is unclear from the record whether the "checking in" process was performed by IUC staff, off-duty police officers, or unformed guards employed by "Overwatch," Summit's firm of armed guards, which astonishingly, was providing security functions at this public meeting, making Iowa one of many states in which these armed guards have acted on behalf of Summit. Petitioners are unclear as to how a state agency permitted an applicant's armed guards into the hearing room. See *Argus Leader, May 30th, 2023,* for another state's example of such tactics. One senses a pattern.

of the largest automobile dealerships in Iowa, two hotels, a strip mall, a dental office, a potential

site of a Career Academy, a bank. It is one-half mile from the Floyd County Medical Center. The

alternative route has another natural gas pipeline in that industrial park[4]. See IUC decision 357-

358.

22.  From August 22 through November 8, 2023, hearings were held through out Iowa,

in the affected communities.

23.  On July 10, 2023, RLIJ requested that the Board authorize the RLIJ to intervene in

this case.

24.  On July 19, 2023, the Iowa Utilities Commission granted RLIJ's petition to

intervene.

25.  On June 25, 2023 the Iowa Utilities Board issued its "Final Decision and Order"

(the "FDO") approving, subject to certain limitations and conditions, a permit for Summit

Carbon Solutions, LLC ("Summit").[5]

26.  The RLIJ submitted a "Motion to Reconsider" the final decision July 15, 2023.

27.  The Petitioners asserts that the order contains findings that, when analyzed in

light of the full evidence before the Commission, are in error; and its substantive legal

conclusions are contrary to binding precedent, statutes, and Constitutional principles.

---

[4] For further guidance as to why the CCADC remains concerned about the IUC's route, please see this article regarding a CO2 leak in another state. The Court will notice that the *existence* of the CO2 leak at issue here became known due to the leak's effect on a property owner's *pet cats*. To petitioner's knowledge, there are no cats in the industrial park to provide a similar warning to its business owners and customers. It is not conjecture to address the danger when one understands that CO2 is poisonous, "Colorless, odorless, and heavier than air, carbon dioxide can travel undetected and at lethal concentrations over large distances." *Louisiana Illuminator, May 1, 2024*.
[5] https://iowa5.sharepoint.com/sites/IUB-EFS-PROD/Documents/Forms/AllItems.aspx?id=%2Fsites%2FIUB%2DEFS%2DPROD%2FDocuments%2FDocket%2F2024%2F06%2F25%2FHLP%2D2021%2D0001%5FOrder%5F2024%2E06%2E25%5F2147516%5F240625%2D143412%2Epdf&parent=%2Fsites%2FIUB%2DEFS%2DPROD%2FDocuments%2FDocket%2F2024%2F06%2F25&p=true&ga=1

28.     Scores of Iowa submitted thousands of pages of testimony and comments. Everyday Iowans and state legislators showed not with conjecture or anecdote, but with evidence, that this pipeline was naturally a bad idea, but as proposed violated Iowa law. However, it falls well outside the restrictions placed upon grants of Eminent Domain in the Iowa Constitution and in the Iowa Code. In spite of the evidence, the Board approved the CO2 hazardous liquid pipeline on June 25th.

**Factual Background**

29.     The Iowa Utility Commission stated that they had listened to the farmers and witnesses and addressed their concerns about the carbon summit pipeline; however, the board did not listen to many of the concerns and thought they were frivolous.

30.     If given the chance, landowner petitioners only had a few opportunities to submit comments in testifying. Moreover, the IUC and the testimony process were confusing and often misleading, causing Iowans to lose their ability to testify against the pipeline.

31.     The pipeline's construction will undoubtedly lead to soil compaction, mainly when machinery operates in wet conditions. This compaction of subsoil, once it occurs, can be almost impossible to remediate, leading to long-term yield reductions. The soil becomes denser, its porosity reduces, and root growth is impeded, ultimately affecting crop yields for decades.

32.     Summit's restoration promises are just that, promises. Landowners' experiences with similar projects show that farmland is often not restored to its original productivity, leaving the land permanently degraded.

33.     This soil damage will severely affect their economic livelihoods. The land's long-term productivity is crucial for farmers, and any permanent damage or reduction in fertility could result in significant financial losses.

34.     Summit's compensation will not fully cover the extent of these losses or the impact on property values, leaving many Landowner Petitioners financially disadvantaged.

35.     Drainage tilessystems are critical for farmers and the farmland they work on. Damaged during construction, can lead to water pooling and reduced crop productivity. The Landowner Petitioners testified that damage to their drainage tile systems is inevitable should construction commence, and repairing tile systems to their original precision is often impossible, leading to long-term drainage issues and water damage. This further exacerbates concerns about soil fertility, yield loss, and economic damage.

36.     Landowner Petitioners face severe issues with insurance coverage. Many insurance policies have pollution exclusions. These classify $CO_2$ as a pollutant. Traditional insurance policies would not cover any damages caused by a $CO_2$ leak or rupture. Landowner Petitioners have testified that they have been unable to find adequate liability insurance for $CO_2$-related risks. This leaves them exposed to significant financial risks in the event of a pipeline accident. Summit promised to repay landowners; however, this amount is woefully insufficient.

37.     Rural Landowner Petitioners are particularly concerned about the perpetual nature of the easements Summit seeks[6]. Because of the petion These easements would limit the ability of Landowner Petitioners to use and develop their land fully, as Summit would maintain control over pipeline access indefinitely. These restrictions would affect the current Landowner Petitioners and future generations, essentially locking the land into restricted use indefinitely. This is particularly problematic because farmland is often passed down through families, and any long-term restrictions will affect the viability of farms as family businesses.

---

[6] This seemingly endless process, instigated by the Summit, has already put encumbrances, in fact, on all the Petitioner landowners, of course, without any compensation.

38.     These easements allow Summit to modify or reconfigure the pipeline route at any time, with no additional compensation to the landowner for the inconvenience or costs this could cause. Additionally, Landowner Petitioners are concerned that Summit will be able to control what can be done on the land above the pipeline, such as planting trees or making any significant changes to the land, severely limiting the landowner's rights and ability to use their property as they see fit.

39.     These easements allow Summit to modify or reconfigure the pipeline route at any time, with no additional compensation to the landowner for the inconvenience or costs this could cause.

40.     The presence of the pipeline, with its soil damage, drainage tile damage, associated risks, and restrictions, will decrease property values. The potential for long-term damage, combined with the limits imposed by the easement agreements, means that Landowner Petitioners may find it difficult to sell their land or pass it on to future generations.

41.     Landowner petitioners are particularly concerned about the health risks posed by $CO_2$ leaks from the pipeline. $CO_2$ is odorless and invisible, making it difficult to detect during a rupture. Additionally, $CO_2$ is heavier than air, sinking into low-lying areas and creating hazardous conditions far from the leak site. The potential for fatal accidents in the event of a leak has been highlighted, with Landowner Petitioners fearing the long-term health and safety risks associated with the pipeline's proximity to homes and farm

42.     Charles City is one of the many communities this $CO_2$-hazardous liquid pipeline impacts. As proposed, the Summit's hazardous $CO_2$ pipeline would bisect Charles City Area Development Corporation's (CCADC) Avenue of the Saints Development Park. CCADC paid $2.156 million for the property purchase. CCADC accrued tens of thousands of dollars in

authenticating the site within Iowa's Certified Sites program. This designation demonstrates that multiple due diligence factors have been achieved, saving companies valuable time planning and executing projects. This means that the Avenue of the Saints Development Park is already ready for development, and base infrastructure has been laid; all but for the signing of papers and the cloud of the pipeline, the Avenue of the Saints Development Park is as close to being developed as a parcel can get. There are only 29 certified sites in Iowa. CCADC seeks to become the first site to receive the GOLD standard designation. CCADC holds that the site is eminently marketable owing to being 600 feet from the Avenue of the Saints, a four-lane thoroughfare connecting St. Paul, Minnesota, and St. Louis, Missouri. The Avenue portends readily available truck access and a labor recruiting tool owing to labor fluidity.

43.     The Petitioners maintain that the order contains many factual findings that, when analyzed in light of the evidence before the Commission, appear to be in error and many legal conclusions contrary to binding precedent, statutes, and Constitutional principles.

## Due Process in Administrative Rulemaking and Agency Action

44.     Iowa Code § 17A.1 governs contested case proceedings, and guarantees fairness and due process.

45.     When an agency, such as the IUC, takes action affecting the legal rights of individuals, the due process provisions in Chapter 17A ensure that the agency follows a transparent, evidence-based process. Failure to follow these procedural safeguards, such as not allowing sufficient time for parties to present their evidence or failing to provide written explanations of decisions, would violate due process and subject the agency's actions to judicial review.

Case 6:24-cv-02046-LTS-MAR    Document 1    Filed 09/10/24    Page 9 of 26

46.     Iowa Code § 17A.2(5) defines a contested case as any proceeding where a party's legal rights, duties, or privileges must be determined after an evidentiary hearing.

47.     This applies to both the hazardous liquid pipeline permit proceedings and eminent domain decisions.

48.     Iowa Code §17A.12(4) guarantees that all parties can respond, present evidence, and argue on all issues for any contested case proceeding.

49.     Iowa Code § 17A.12(8) requires that findings of fact in such cases must be based solely on the evidence presented during the hearing and official matters noticed in the record.

50.     The decision must also explain why the relevant evidence in the record supports each material finding of fact, not general summations like those filed in the decision.

51.     These provisions ensure that decisions are made transparently, based on substantial evidence, and that all parties know the reasoning behind the rulings.

52.     The IUC's decision is sparse on substantial evidence for each eminent domain consideration, generally and specifically under 479B.

**Constitutional Due Process Protections**

53.     Both the federal and state Constitutions require that due process be observed when legal rights, privileges, or duties are at stake.

54.     The Fifth and Fourteenth Amendments of the U.S. Constitution guarantee that no person shall be deprived of life, liberty, or property without due process of law.

55.     Similarly, Article I, Section 9 of the Iowa Constitution protects against arbitrary deprivation of rights by ensuring due process is afforded in administrative and judicial proceedings.

Case 6:24-cv-02046-LTS-MAR   Document 1   Filed 09/10/24   Page 10 of 26

56. The Iowa Utilities Commission (IUC) is obligated to follow due process protections when adjudicating issues involving the granting of permits for hazardous liquid pipelines and eminent domain for all individuals, including CCADC.

57. Due process in this context requires a full and fair hearing, an unbiased decision-maker, and a decision based on evidence presented during the proceedings.

## Public Use and Eminent Domain

58. Section 479B.16 addresses the use of eminent domain for hazard liquid pipelines. It provides, in part:

A pipeline company granted a pipeline permit shall be vested with the right of eminent domain, to the extent necessary and as prescribed and approved by the board, not exceeding seventy-five feet in width for right-of-way and not exceeding one acre in any one location in addition to right-of-way for the location of pumps, pressure apparatus, or other stations or equipment necessary to the proper operation of its pipeline. Iowa Code § 479B.16.

59. Article I, Section 18, the takings clause in the Iowa Constitution, states in part,

Private property shall not be taken for public use without just compensation first being made or secured to be made to the owner thereof as soon as the damages shall be assessed by a jury, who shall not take into consideration any advantages that may result to the said owner on account of the improvement for which it is taken. Iowa Const. art. I, § 18.

60. The Fifth Amendment to the United States Constitution similarly provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

61. Summit must prove that the project satisfies the Constitutional requirement of "public use " before using eminent domain to acquire land from unwilling property owners.

62. The Iowa and U.S. Constitutions both restrict eminent domain use for private purposes.

63.     The 2019 Iowa Supreme Court decision in *Puntenney v. Iowa Utilities Board* introduced a balancing test that was the dissenting opinion in the <u>*Kelo v. City of New London,*</u> 545 U.S. 469, 125 S. Ct. 2655, 162 L.Ed.2d 439 (2005). In *Kelo,* the US. Supreme Court addressed whether a city's decision to take property for economic development to remedy decades of economic decline satisfies the Fifth Amendment's `public use' requirement." *Id.* at 473-477, 125 S. Ct. at 2658-2661.

Justice O'Connor's dissenting opinion, she reasoned that:

In moving away from our decisions sanctioning the condemnation of harmful property use, the Court today significantly expands the meaning of public use. It holds that the sovereign may take private property currently put to ordinary private use, and give it over for new, ordinary private use, so long as the new use is predicted to generate some secondary benefit for the public -- such as increased tax revenue, more jobs, maybe even aesthetic pleasure. But nearly any lawful use of real private property can be said to generate some incidental benefit to the public. Thus, if predicted (or even guaranteed) positive side-effects are enough to render transfer from one private party to another constitutional, then the words "for public use" do not realistically exclude *any* takings, and thus do not exert any constraint on the eminent domain power.

64.     The Justice opined that "a secondary benefit alone was not enough for a governmental transfer of property from one private entity to another to qualify as a taking for a public purpose. This dissent in the United States Supreme Court became the basis for the majority's opinion in the corresponding Iowa case, *Puntenney v. Iowa Utilities Board.* Since the days of *In Re Ralph*, the Iowa Supreme Court has been fiercely protective of its proper role to provide greater protections for Iowans under our constitution than the federal constitution itself may require. When similar constitutional provisions are at issue in Iowa, the Court will "jealously guard it as our right and duty to differ from the Supreme Court, in appropriate cases, when construing analogous provisions in the Iowa Constitution." *Hensler v. City of Davenport, 790 N.W.2d 569, 579 n.1 (Iowa 2010).* In *Puntenney,* the

Court indeed stood as our guardian, and unlike in *Kelo*, expressly banned eminent domain takings for economic development purposes. This is how Justice O'Connor's *dissent* in that important case became the law of the land in Iowa.

65.    As stated in *Puntenney* the Iowa Supreme Court found that trickle-down benefits of economic development are not enough to constitute a public use. As stated, *Puntenney,* Iowa is a heavy user of petroleum products. Under *Puntenney, the grant of eminent domain* provided cheaper and safer oil transportation. Thus, due to that service, a broad public interest and public interest was created.

66.    The Court held that public use demands a direct benefit to the public, not just indirect economic advantages for private entities.

67.    Summit's pipeline does not offer similar primary public benefits.

68.    In fact, it has taken public benefits from the CCADC, lawmakers, and the other Petitioners.

69.    Iowa law requires that eminent domain only be exercised if the project serves a public use, such as roads, public utilities, cheaper energy prices, or improved infrastructure, that benefits the general public. It is not a *grant* of power to the state but a *restriction* on the power of the state.

70.    To that, the IUC's role with regard to eminent domain generally, and in 479B permits like this one, *on paper*, is consistent with Puntenney's restrictions on government takings:

> "It is the purpose of the general assembly in enacting this law to grant the utilities board the authority to implement certain controls over hazardous liquid pipelines **to protect landowners and tenants from environmental or economic damages** which may result from the construction, operation, or maintenance of a hazardous liquid pipeline or underground storage facility within the state, to approve the location and route

Case 6:24-cv-02046-LTS-MAR   Document 1   Filed 09/10/24   Page 13 of 26

of hazardous liquid pipelines, and to grant rights of eminent domain where necessary.
*Iowa Code, Chapter 479B.1*

71.     The commission is solely mandated to *mitigate* economic or environmental harm. It is a grant of negative authority. The Commission's role is to protect landowners from economic or environmental harm. Had the Iowa Legislature intended to grant the IUC independent policy making authority to create some affirmative economic or environmental policy, that grant of power would be *in this very statute.* While the Legislature may choose to create one in the future, there is no provision in Iowa law allowing the IUC to use such considerations in defining *necessary* for the purposes of this permitting chapter. Nonetheless, the Commission's ruling in favor of the applicant is exclusively tied to policy decisions that the Board is not permitted to make.

72.     The Commission, however, made significant policy judgments in its ruling, and the ruling specifically asserts that its permitting of this application is primarily tied to private financial interests and applicant's use of the limited 45Q tax credits. *See* 26 U.S.C. §45Q. The Commission's ruling for building the pipeline is to capture federal 45Q tax credits, which provide revenue to private investors. The Commission did not try to hide this; in fact, the tax credit justification "weighs heavily" in the ruling. *Ruling* at 239- 232[7].  This is the only factor the commission *weighed heavily*. The Commission followed with policy statements regarding its prescriptions for state policy in matters relating to fuel production and marketing, propping up twelve individual companies, assisting in some future attractiveness for other such companies to come to Iowa, and then, workforce development matters.  The Commission does not stop there.

---

[7] https://iowa5.sharepoint.com/sites/IUB-EFS-PROD/Documents/Forms/AllItems.aspx?id=%2Fsites%2FIUB%2DEFS%2DPROD%2FDocuments%2FDocket%2F2024%2F06%2F25%2FHLP%2D2021%2D0001%5FOrder%5F2024%2E06%2E25%5F2147516%5F240625%2D143412%2Epdf&parent=%2Fsites%2FIUB%2DEFS%2DPROD%2FDocuments%2FDocket%2F2024%2F06%2F25&p=true&ga=1

The Commission also makes significant policy decisions regarding climate change, and additional revenues to counties and other subdivisions. To remind the Court, in the middle of all of these policy prescriptions, the Commission only found *one* factor to weigh heavily in favor of the applicant: tax credits. This is the economic development issue *Puntenney* bans.

73.     Until if and when the Legislature and Governor decide otherwise via the lawmaking process, the state agencies permitted to develop and enforce the above-mentioned policies are, respectively, the Iowa Economic Development Authority, the Iowa Department of Agriculture and Land Stewardship, the Iowa Department of Revenue, the Iowa Department of Workforce Development, and the Iowa Department of Natural Resources.

74.     The Commission *did* follow its statutory direction in two key areas. Specifically, the ruling concluded that the "impact to landowners" weighs against the application, and, "As it relates to safety, the Board finds this factor weighs against Summit Carbon…" The Board qualifies its safety ruling by stating that safety concerns are "…mitigated by Summit Carbon's commitments…[8]", an extraordinary amount of trust for a quasi-judicial agency to place in a regulated company.

75.     The Court in *Puntenney* could not be more clear; a taking for economic development purposes is not permissible in Iowa. Upon a review of the commission's ruling as a whole, it is implausible to consider the application as anything *but* a taking for economic development purposes. While the Court will defer to agencies on how to define 'public convenience and necessity,[9]'it is counterfactual to suggest that the Court would permit an agency – in this case, the Iowa Utilities Board – to use its authority to define terms as an off-ramp for compliance with black letter law in Iowa. The Commission's magic words of "climate change,"

---

[8] *Id at 242.*
[9] *Puntenney at 15, citing Renda v. Iowa Civil Rights Comm'n, 784 N.W.2d 8, 14 (Iowa 2010.)*

"jobs," and "$1.9 billion dollars spent in Iowa" aren't *off-ramps* either. The Commission going beyond its authority in considering these things is a convenient way to sanitize the fact that Summit's application benefits one commercial entity, some named and some nameless owner-investors. One does not have to be a Philadelphia lawyer, mind-reader, or giant of industry to understand that when a company wants to spend money here, *it's so they will make more money*. And they are free to do what anyone else must do they can buy an easement.

76. Apart from the problem with the Commission's reliance on tax credits, it is telling that the Board issued its strongest showing of support regarding tax credits while making a bet that the policy is not likely to change. This is a political judgment[10], not a legal or factual one. This policy decision is, in fact, subject to change, amendment, or repeal at the *whim* of a future United States Congress or President.T

77. If economic development alone were a valid public use, then instead of building a hazardous liquid pipeline cutting our town in half, Summit could constitutionally *"condemn Iowa farmland to build a palatial mansion,[11]"* so long as that mansion provided added revenue or temporary jobs or - it seems, given the IUB's deference to Summit - valuation to the company. *Should this ruling stand, we have found the palatial mansion, and it is in the form of federal tax credits*.

78. The Board asserts that it did not consider economic benefit alone. They will likely point to the text of the permit to claim that other concerns favored or slightly favored the issuance of the permit and, thus, compliance with *Putenenny*. However, by that rationale, the

---

[10] It is self-evident but worth noting, that political judgments can change very quickly and they often do. Anyone who doubts that should take today's newspaper and imagine how it would appear to someone ten years ago. Betting on political stability and rational decision making by national leaders in a highly unusual time *may* turn out well. It is also true that taking one's life savings to a casino in hopes of doubling it *could* work out. Perhaps the Commissioners have a different concept of risk and danger than the families in the *kill zone*.

[11] *Putnenney at* 31.

Board itself could escape *all* appellate review by simply adding dicta. Instead, the Court must look at the application and ruling as a whole and not simply for the "magic words" of things like environment or ethanol. It is axiomatic that this quasi-judicial panel cannot become the judge in its own case simply by adding a superfluous word or term of art. The application and the agency's acts must be viewed for what they do, not what they purport to do. What this ruling does is simple – it takes people's land so that a company can make a lot of money. The IUC's ruling is factually based on economic benefit alone, even this temporary one - for it is the only part of its ruling that can be *factually* established. The rest is hypothetical or, at best, aspirational. The sole item that can be quantified is the state agreeing to a taking to allow an economic benefit to a partially identifiable, small group of natural and corporate persons. Thus, it fails the *Putenanny* test, and the permit does not trigger the high burden of public use, convenience, and necessity, even with the Court's deference to the agency in determining what those factors mean. Deference within clearly established parameters is what Iowa law and the Iowa Supreme Court require. The agency failed to recognize the parameters.

**Eminent Domain for Private Gain**

79.     The pipeline does not provide a utility service, reduce energy prices, or serve the public directly.

80.     Petitioners are concerned about using eminent domain for private gain, which Iowa law and the U.S. Constitution prohibit. The Fifth Amendment to the U.S. Constitution and Article I, Section 18 of the Iowa Constitution protect private property owners from having their property used for purely private uses.

81.     CCADC, for example, paid $2.156 million for the property purchase and accrued tens of thousands of dollars in authenticating the site within Iowa's Certified Sites program. If

the pipeline is built where approved, the CCADC will lose the value of the Avenue of the Saints Development Park marketability to potential developers. The permanent loss of land use rights and the potential for environmental disasters (such as a CO2 pipeline rupture) will all fall on the CCADC and reduce the potential salability of the Avenue of the Saints Development Park. All but for the signing of papers and the cloud of the pipeline, the Avenue of the Saints Development would be developed.

**Constitutional Necessity and Due Process in Eminent Domain**

82.    A heightened standard of due process applies when private property is taken for public use under eminent domain. Both the U.S. and Iowa Constitutions restrict the use of eminent domain to cases where the taking of private property serves a public purpose. This principle is articulated in the Takings Clause of the Fifth Amendment. Article I, Section 18 of the Iowa Constitution stipulates that private property cannot be taken without just compensation and only for public use.

83.    The Iowa Supreme Court, in decisions such as *Puntenney v. Iowa Utilities Board*, has affirmed that eminent domain must be granted in accordance with due process protections, which include ensuring that the taking serves a legitimate public purpose. In the context of hazardous liquid pipelines, the pipeline project must provide a direct public benefit to justify the taking of private property. If the Board or agency fails to demonstrate that the project meets the constitutional standard of "public use," then any grant of eminent domain would be invalid under due process principles.

**Federal Law and Common Carrier Practices**

84.    Federal law does not directly regulate carbon dioxide (CO2) pipelines like it regulates oil and natural gas pipelines, but it can still guide the common carrier standard. The

Federal Energy Regulatory Commission (FERC) mandates that interstate oil pipelines must operate as common carriers, providing transportation services to third-party shippers on reasonable and non-discriminatory terms. See *Hepburn Act of 1906* (34 Stat. 589).

### Common Carrier

85.    Iowa Code Chapter 479B governs the regulation of hazardous liquid pipelines and sets the framework for when eminent domain can be applied. Iowa Code § 479B(16) provides that eminent domain can only be used if the pipeline project is "necessary to the function of a common carrier."

86.    Iowa Code § 6A.22(2)(a)(2) specifically requires that any pipeline using eminent domain must function as a common carrier.

87.    A common carrier is a company that transports goods or services for the public and must provide its services indiscriminately to all customers under fair and reasonable terms. This means that a common carrier transports goods or services for the public, serving a public utility. Iowa Code § 6A.22(2)(a)(2) authorizes eminent domain for pipelines only if they operate as common carriers, akin to public utilities like railroads or gas companies. Summit only transports supercritical CO2 from select ethanol plants.

88.    The Iowa Supreme Court's decision in *Mid-America Pipeline Co. v. Iowa State Commerce Commission* 114 N.W.2d 622 (1962) denied a pipeline company the right to use eminent domain because the pipeline only transported its products to itself and was not a common carrier.

89.    The Court held that a pipeline serving only private purposes cannot claim the right to eminent domain.

90.     Unlike *Puntenney*, where a "walk up" can factually exist, the "walk up" is fictional here. It is a hypothetical offering to a CO2 market in Iowa. This is critical because it means that even if one day it's *true* and can be shown as such (for example, with evidence from a *private pipeline performing similar services*,) the CO2 market is a wish list, which, unlike the pipeline in *Puntenney*, has no infrastructure to satisfy its claim of being a common carrier. At best, it is "If you let us do this, if and when business conditions are right, and more factories beyond our control are built, then we will let 10% of our assets help them as we are obliged to as a common carrier." The applicant cannot say when, how, or whether that happens. "*If you build it, they will come[12],*" is not the legal standard for establishing a common carrier.

91.     The Legislature *did* give the IUB interpretative authority regarding specifically defined hazardous liquids, including CO2, but it did not provide the IUB with a broad grant of authority to determine novel questions.

92.     The Court **expressly** permits liquid petroleum eminent domain for pipelines that transmit oil and hydrocarbons because of the general reliance on gas and the benefit of cheaper petroleum distillates and the ease with which the company applying for the permitting in that case could become a common carrier.

93.     This is further evidence that eminent domain is not a *grant* of power to the state but a *restriction* on the power of the state.

94.     The same application at issue here - had it involved moving oil or hydrocarbons may well be a proper taking, but the court in *Puntenney* explicitly held that an environmental benefit of *not* building a pipeline cannot be grounds for preventing an eminent domain claim when the public benefit is directly or nominally related to even things such as lowering costs for

---

[12] Paraphrasing, not quoting, *Field of Dreams, Universal Pictures, 1989.* Fortunately for the residents of Dyersville, Summit's proposed expansion route stops one county over. So the famous field is safe – **for now**.

gas at the pump or even simply helping maintain the supply of petroleum distillates to the market. Under *Puntenney's* rejection of *Kelo*, Summit cannot claim economic benefits as its public convenience and necessity. Its only possible justification would be for an environmental claim related to the sequestering of $CO_2$ and that somehow, the people of Iowa collectively benefit from that.

95.     Whether that is factually true or false is irrelevant. To the extent that the Court has weighed on collective, novel environmental factors affecting an eminent domain claim, we should note that such claims have been met with skepticism, as was the case with opponents of the Bakken pipeline. While we do not propose that the *absence* of a ruling *creates a prohibition*, the Court's dismissal of such factors in its broad analysis of the takings clause and attendant statutes is essential. Suppose a wide and novel environmental claim failed at stopping the Bakken. In that case, it certainly follows that a broad and novel environmental claim – Summit's - would not satisfy the clauses at issue here.

96.     In plain terms, *Puntenney* states that an environmental consideration is a policy decision. While the IUB has jurisdiction over hazardous liquid pipelines - no question - *Puntenney* indicates that not all pipelines are the same.

97.     Summit's pipeline is designed to transport supercritical $CO_2$ exclusively for the ethanol plants signed on to the project. <u>It is not open to the public or transporting a good or service that is essential to the public, such as energy or water</u>. See *Puntenney v. Iowa Utilities Board.* The pipeline will not offer transportation services to third-party customers or function like a public utility. This makes it a private pipeline, serving a narrow set of interests.

98.     Unlike oil or natural gas pipelines, Summit does not meet the common carrier requirement, which transports energy resources to the public.

Case 6:24-cv-02046-LTS-MAR   Document 1   Filed 09/10/24   Page 21 of 26

99.     This product is not for public use but for permanent disposal, benefiting Summit and a small group of ethanol plants participating in the carbon capture initiative. It is, in fact, *the most uncommon of carriers*.

## Permanent Easements and Property Restrictions

100.   Summit is to receive permanent easement rights over Iowa land, granting Sumit perpetual access to the Petitioners' land for pipeline construction, maintenance, and operation.

101.    These activities affect the property's salability. Because of the pipeline's cloud, the Avenue of the Saints Development Park's salability is reduced and currently on hold.

102.    Moreover, the easement terms proposed by Summit would severely limit landowners' ability to use and develop their property.

103.    Summit would have 24/7 access to Petitioner's land and the ability to make land-use decisions. These restrictions would significantly devalue the affected properties, affect their salability, and impose an undue burden on the future Avenue of the Saints Development Park landowners for a project primarily benefiting private interests.

## Local Impact and Property Value Reductions

104.   Another significant legal and economic argument is the negative impact the pipeline would have on the property values of Petitioners' land. Petitioners specifically addressed this concern in their public comments and letters to the IUC. A hazardous liquid pipeline on their property will reduce the property values, something that state lawmakers know a great deal about.

105.   Lower property values, in turn, would lead to lower property resale amounts, negatively impacting public services like schools, emergency services, and infrastructure maintenance.

106.    These local governments will look to the state to backfill the lost taxes. This will strain the public purse and do not benefit the state as a whole.

107.    If the Summit pipeline is allowed to be built where it has been planned, it will negatively affect public services in Charles City and Floyd County as well as Petitioners' farmland.

108.    The reduction in property values and the property's salability is a significant negative consequence of the project, one that Summit has not adequately addressed in its permit application.

**Federal Preemption and Safety Standards**

109.    Federal law is prescriptive. The federal Pipeline Hazardous Materials Safety Administration (PHMSA) is the standard that Utility boards nationwide have to follow. The order fails to consider the consequences if Summit does not follow the PHMSA requirements or even if the PHMSA requirements apply. They neglect the federal requirement to follow and enforce the letter of the law.

**Environmental and Safety Risks**

110.    Significant environmental and safety risks are also associated with the transportation of supercritical $CO_2$. A pipeline rupture could release $CO_2$, posing health risks to nearby communities.

111.    As pointed out in the RLIJ's "Motion to Reconsider," the lawmakers are concerned about the "kill zone."

112.    The IUB's and Summit's data and experimental process were hidden from the public and cannot be verified.

113.    Accordingly, a significant number of Iowans – those who are in the Kill Zone but who are not yet aware of their status – have been excluded from even rudimentary due process in the IUC's consideration of the Summit application.

114.    Further, the Petitioners are concerned about the insurance level that Summit must carry from the IUC's decision.

115.    The IUC's order assumes, without evidence in the record, that the risk profile of a natural gas leak is identical to supercritical $CO_2$. It simply is not. Carbon dioxide is heavier than air. *Rasmus v. A. O. Smith Corp.*, 158 F.Supp. 70, 73 (N.D.Iowa 1958).

116.    This will put any development, businesses, or any one at risk.

**Constitutional Safeguards and Precedent**

117.    Many sections of the Iowa Code emphasize the importance of protecting landowners from environmental and economic damages caused by hazardous liquid pipelines. Summit's proposed pipeline would cross thousands of private properties, creating concerns among landowners about property devaluation and future land use restrictions.

118.    The Iowa Constitution, the Federal Constitution, and case law vigorously protect against the misuse of eminent domain for private projects. The Iowa Supreme Court has consistently ruled to protect property owners' rights, requiring an apparent public use to justify taking private land.

119.    Summit's proposed pipeline faces significant legal, economic, and environmental challenges. From the lack of a clear public benefit to the failure to meet common carrier requirements, the project does not justify using eminent domain under Iowa law or the United States Constitution. The economic benefits are speculative, the environmental risks are substantial, and the burden on landowners is excessive. Based on these factors, the Courts should

overturn the Iowa Utilities Commission's decision to grant Summit's permit application for eminent domain.

120.   In the absence of more definite public scientific studies (e.g., peer-reviewed scientific studies that are subject to cross-examination in this proceeding and definitive safety protocols from federal and state regulators regarding the type of pipeline proposed by Summit), the $100 million insurance coverage required by the Board appears to have been pulled from low-line $CO_2$ air.

121.   Publicly available information suggests that the $100 million insurance coverage, is as a matter of law and public policy, grossly inadequate to insure the risk involved with the heavier supercritical $CO_2$. See Motion to Reconsider, pg. 6, 7.

### *Prayer for Relief*

**Wherefore**, the Petitioners prays that the Court enter an order as follows:

(A)     enter a judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that the Summit Pipeline plan located in RLIJ will have the Charles City Area Development Corporation, Avenue of the Saints Development Park, is unconstitutional, null, and void and order the Summit Carbon Pipeline to be rerouted according to the alternative route.

(B)     enter preliminary and permanent prospective injunctive relief enjoining the IUC, through its members, agents, servants, employees, and attorneys, and all persons in active concert and participation with the IUC, Summit Carbon Pipeline from enforcing the approved route for the Charles City Area Development Corporation.

(C)     Grant the Petitioners their reasonable attorneys' fees and costs.

(D)     Grant the Petitioners such other and further relief as the court may deem proper.

Respectfully Submitted,

/s/Jefferson Fink
Jefferson Fink (AT0013402)
Law Office of Jefferson Fink
3616 University Ave. Suite 11
Des Moines, IA, 50311
Tel: 515-720-9892
Email: law.fink@outlook.com
Attorney for Petitioners

Of Counsel

/s/ Charles M. Thomson
Charles M. Thomson (AT0010387)
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com

| CERTIFICATE OF SERVICE |
|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses on the      pleadings on: Tuesday, September 10, 2024 |
| By:<br> _X_ U.S. Mail     ___ Fax<br>    ___ Hand Delivery   ___Overnight Carrier<br>    _X_ EDMS       ___ Email<br><br>Signature:   *ic/s/Jefferson Fink* |