# STATE OF IOWA
# BEFORE THE IOWA UTILITIES COMMISSION

| IN RE: | ) | DOCKET NO. HLP-2021-0001 |
|---|---|---|
| | ) | |
| SUMMIT CARBON SOLUTIONS LLC | ) | MOTION TO RECONSIDER |
| | ) | |

NOW COME the RLIJ, by and through their counsel, and as and for this "Motion to Reconsider" (this "Motion[1]") respectfully state as follows:

The RLIJ is an unincorporated association of 36 Members[2] of the Iowa General Assembly, who, on behalf of themselves, their constituents, and all citizens of the State of Iowa, are concerned with protection of Iowa's environment, protection of the rights and liberties granted Iowans under the United States and Iowa Constitutions, and protection of the safety and well-being of Iowans generally. Pursuant to the "Order Addressing Petitions to Intervene" dated July 19, 2023, the Iowa Utilities Board[3] granted RLIJ's petition to intervene in this matter. See July 19, 2023, Order at 10.

---

[1] The provisions of the Iowa Administrative Code discussing reconsideration of a ruling reference an "application" for reconsideration rather than a "motion." See Iowa Admin. Code 199-7.27(17A,476). The RLIJ respectfully request that this document be considered both an "application" and a "motion," to the extent the Commission or another party may deem a "motion" to be an inappropriate mechanism for requesting the relief sought hereunder.

[2] The RLIJ originally consisted of 20 Members of the Iowa General Assembly. The RLIJ are now Senator Kevin Alons, Senator Rocky De Witt, Senator Lynn Evans, Senator Jesse Green, Senator Dennis Guth, Senator Mark Lofgren, Senator David Rowley, Senator Sandy Salmon, Senator Jason Schultz, Senator Jeff Taylor, Senator Cherielynn Westrich, Representative Eddie Andrews, Representative Brooke Boden, Representative Steven Bradley, Representative Ken Carlson, Representative Mark Cisneros, Representative Zach Dieken, Representative Dean Fisher, Representative Dan Gehlbach, Representative Thomas Gerhold, Representative Cindy Golding, Representative Helena Hayes, Representative Bob Henderson, Representative Steven Holt, Representative Heather Hora, Representative Thomas Jeneary, Representative Bobby Kaufman, Representative Joshua Meggers, Representative Anne Osmundson, Representative Bradley Sherman, Representative Jeff Shipley, Representative Luana Stoltenberg, Representative Henry Stone, Representative Mark Thompson, Representative Charles Thomson, and Representative Skyler Wheeler

[3] As of July 1, 2024, the "Iowa Utilities Board" was renamed the "Iowa Utilities Commission," pursuant to 2024 Iowa Acts, S.F. 2385.

1

On June 25, the Iowa Utilities Board issued its "Final Decision and Order" (the "FDO") approving, subject to certain limitations and conditions, a permit for Summit Carbon Solutions, LLC ("Summit") under this docket. Pursuant to 199 Iowa Administrative Code rule 7.27(1), "Any party to a contested case may file an application for rehearing or reconsideration of the final decision." The rule also states that "Applications for rehearing or reconsideration shall specify the findings of fact and conclusions of law claimed to be erroneous, with a brief statement of the alleged grounds of error." Iowa Admin. Code 199-7.27(2).

The RLIJ respectfully submit that the FDO contains a number of findings of fact that, when analyzed in light of the evidence before the Commission, appear to be in error, and a number of legal conclusions that are contrary to binding precedent, statutes and Constitutional principles. A summary of these alleged errors follows.

**I.      Errors related to due process.**

**Specification of findings of fact and conclusions of law claimed to be erroneous.**

The RLIJ specify the following text (at page 470, *et seq*.) in the FDO to be in error:

> As it relates to due process arguments, the Board simply notes it conducted a hearing for eight weeks, which amassed a transcript spanning nearly 7,500 pages. The Board has received and reviewed almost 4,200 comments, including admitting more than 600 comments filed after the submission deadline. The Board received and reviewed approximately 50,000 pages of prefiled testimony and exhibits from hundreds of witnesses — experts and landowners alike.
> During the hearing, the Board made great exceptions to its rules to allow parties to file untimely testimony, to cross-examine witnesses that generated unduly repetitious testimony, and to remove all guards normally adhered to during a Board proceeding, all in the interests of justice to ensure landowners were able to provide their testimony to the Board.
> In addition to the events at hearing, the Board sent mailers to all Exhibit H landowners in June 2023 to ensure they were made aware of their options to participate in the hearing. The Board provided landowners with options ranging from testifying at the hearing, to submitting comments, to mediation, to not wanting any further contact.

The Board received feedback from landowners regarding all of these options. The Board finds it provided due process to all those involved, and to claim otherwise ignores the facts and events of this case.

**Statement[4] of the alleged grounds of error:**

A. Although one of the legal criteria to be used by the Commission in its determination is "public convenience and necessity," large swaths of the public were excluded from meaningful participation in the IUC process.

B. Specific persons (such as the Hennings Family Trust and the King Intervenors[5]) who demonstrated various cognizable injuries should the project proceed, were flatly excluded from giving testimony.

C. The precise parameters of the project's kill zone[6] (the "Kill Zone") remain open to conjecture, and much of the research on the topic has been hidden from the public. Accordingly, a significant number of Iowans – those who are in the Kill Zone but who are not yet aware of their status – have been excluded from even rudimentary due process in the IUC's consideration of the Summit application.

D. As the tenor of the text quoted above indicates, the public statements and conduct of the IUC throughout the consideration of the Summit petition has been that of an irritated homeowner who has been "put upon" and inconvenienced by irksome, uninvited, ill-mannered

---

[4] Iowa Admin. Code 199-7.27(2) requires this statement to be "brief," so this Motion limits its discussion of these errors to identifying the general tenor of the alleged error, rather than presenting a formal legal argument as to the point asserted.

[5] Hon. Steve King, Michael Daly, Mark Joenks, Ted Junker, James and Janet Norris, Jeffrey Reints, and Jessica Wiskus.

[6] As used herein, the term "Kill Zone" means that area in which there is a non-zero risk of death or significant injury arising from or related to either an accidental release of the contents of the pipeline or sabotage on the pipeline.

houseguests.  Thus, for example, the Board "**simply notes**"[7] that it "**amassed**" lots of comments from hearing that lasted "**eight weeks**" and had to endure "**unduly repetitious**" testimony from little people getting in the way of a big project.

    E. The effect of the IUC approach has been to (a) chill speech, (b) generate, for at least part of the general public, the conclusion that the IUB was determined to approve the Summit petition, no matter what the testimony showed or the law required, and (c) erode, in the opinion of at least some Iowans, the confidence that Iowa's government cannot be "bought" by "malefactors of great wealth."[8]

    F. The conclusory nature of the specified text and its implicit dismissal of all criticism is error in the sense that it deprives all parties their due process right to a determination of this matter by a tribunal that is perceived by all parties to be scrupulously fair.[9]

    G. The exact identities of the owners (and, accordingly, long-term managers) of the proposed project have not been disclosed.  Accordingly, the public and affected persons have not had sufficient opportunity consonant with due process to examine and test the proposed exercise of government authority requested by Summit.

## II. Errors related to inadequate requirement for insurance.

**Specification of findings of fact and conclusions of law claimed to be erroneous.**

---

[7] The "simply notes" comment appears to assume that any public entity holding multiple hearings has met the requirement that parties be given due process.  The RLIJ assert that due process standards can never been assumed to have been met just by counting hearings.

[8] Special to The New York Times, *Pledges Remainder of Administration to Obtaining Honest Observance of Law. Take No Vindictive Action / But Voices Determination to "Punish Certain Malefactors of Great Wealth."/ Hints at Wall Street Plot / President's Speech at Laying of Pilgrim Monument Embodies His Corporation Programme,* N.Y. TIMES, Aug. 21, 1907, at 1 and 2 (col. 3).

[9] <u>Caperton v. A.T. Massey Coal Co.</u>, 556 U.S. 868, 881, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). *Accord,* <u>C. Line, Inc. v. City of Davenport</u>, 957 F.Supp.2d 1012, 1039 (S.D. Iowa 2013) ("It is fundamental that due process requires a fair and unbiased tribunal, regardless of whether that tribunal is in the context of a court hearing or some other administrative hearing.'")

4

The RLIJ specify the following text (at page 73, *et seq.*) in the FDO to be in error:

> The Board has reviewed the information and finds that Summit Carbon has submitted a surety bond in the amount of $250,000 pursuant to the requirements of Iowa Code § 379B.13 and 199 IAC 13.3(1)(d). As it relates to additional insurance, Summit Carbon proposed to obtain and maintain a $35 million insurance policy. The Board finds $35 million to be unacceptable for Summit Carbon's proposed project in Iowa.
>
> In Dakota Access, the Board found a minimum of $25 million in insurance was necessary for the 346 miles of 30-inch diameter crude oil pipeline. Dakota Access at pp. 4, 69-70. Summit Carbon is proposing to construct 688 miles of pipe in Iowa. This is essentially two times the amount of pipe Summit Carbon is proposing to construct compared to Dakota Access. In another recent Board decision, the Board determined a 13.74-mile [*sic*] long hazardous liquid pipeline was to obtain and maintain a $2.5 million insurance policy for its project Applying these decisions, the comparable amount of insurance would be between $50 million and $125 million based upon the mileage of Summit Carbon's proposed hazardous liquid pipeline. Additionally, Summit Carbon has yet to construct, operate, and maintain any pipeline, and therefore it does not have the necessary assets or insurance in place as would a company that has already constructed a pipeline. The Board finds a number in between these amounts to be reasonable, given the lack of evidence presented to the Board to otherwise calculate the requisite amount of insurance that Summit Carbon should be required to be maintained.
>
> Should the Board approve the permit, the Board will require Summit Carbon to obtain and maintain a general liability policy in an amount of no less than $100 million and provide proof of such insurance to the Board prior to commencing construction of its proposed project in Iowa. The $100 million insurance policy should cover any and all damages related to the construction, operation, and maintenance of Summit Carbon's hazardous liquid pipeline in Iowa. The entirety of the $100 million policy should be reserved for damages that may occur within the state of Iowa. If Summit Carbon obtains an insurance policy for its entire 2,000-mile [*sic*] long proposed hazardous liquid pipeline, the insurance must clearly state there is at least $100 million specifically reserved for the Iowa portion of the proposed project. The Board finds this condition to be just and proper for the granting of Summit Carbon's permit.
>
> The Board will not require Summit Carbon to add each landowner and tenant as an additional insured party to Summit Carbon's insurance policy. By making the insurance a continuous requirement as a condition of Summit Carbon's permit, Summit Carbon will be required to maintain at least this amount of insurance to ensure landowners have the ability to receive payment, if necessary. The Board will not require Summit Carbon to adjust the insurance policy amount for inflationary changes during the period for which the permit is effective. The insurance policy may be reexamined during the renewal process, if necessary, and any revisions to the policy amount may be a part of that decision.

Lastly, the Board will not require Summit Carbon to submit a decommission calculation as requested by Hardin County BOS. The Board agrees with Summit Carbon that abandoning in place is the default selected by pipeline companies and farmers alike so as to not disturb the soil again. Additionally, Iowa law already has contemplated this requirement in Iowa Code § 479B.32(4), which states "the landowner may require the pipeline company to remove any pipe or pipeline facility remaining on the property." Iowa law already places this responsibility on the company to be prepared to remove an abandoned pipe and should thus act accordingly to prepare for such eventuality.

**Statement of the alleged grounds of error:**

A. The text specified assumes, without evidence in the record, that the risk profile of a natural gas profile is identical to the pipeline proposed by Summit.

B. In the absence of a more definite factual basis (from, for example, publicly available plume studies from persons who are subject to cross examination, and definitive safety protocols from federal and state regulators regarding the type of pipeline proposed by Summit), the $100 million amount required by the Board appears to have been pulled from thin air. It is without evidentiary support.

C. Publicly available information suggests that the $100 million coverage is, as a matter of law, grossly inadequate to insure the risk involved. For example:

   1. Carbon dioxide is heavier than air. *Rasmus v. A. O. Smith Corp.*, 158 F.Supp. 70, 73 (N.D.Iowa 1958).

   2. The proposed Summit route goes to the immediate south of Charles City.

   3. The area south of Charles City through which the pipeline is to pass is at a significantly higher elevation (*i.e.*, more than 100 feet) than the built-up area of Charles City. *See, e.g.*, https://en-gb.topographic-map.com/map-

[m457/Iowa/?center=43.06314%2C-92.71591&zoom=13&popup=43.04339%2C-92.70143](m457/Iowa/?center=43.06314%2C-92.71591&zoom=13&popup=43.04339%2C-92.70143)

      4.      Charles City currently has a population of about 7,600 persons.

      5.      If a massive discharge occurred, and just half of the population of Charles City were in the Kill Zone, wrongful death verdicts at even $3 million each for the impacted estates could exceed $108 billion – or more than 1,000 times the amount of insurance coverage proposed for Summit.

### III. Errors related to Eminent Domain Analysis.

**Specification of findings of fact and conclusions of law claimed to be erroneous.**

The RLIJ specify the following text (at page 109, *et seq.*) in the FDO to be in error:

> The Board has reviewed this evidence and finds that since 2008 it has been federal policy to incentivize the capturing and sequestration of carbon dioxide. The Board has no authority to change federal tax law. While some parties assert this factor is extraneous to the Board's decision, the Board finds otherwise. [*citation omitted*]. The fact the federal government is incentivizing this technology, similar to the governmental incentivization of wind, solar, and ethanol, does weigh into the Board's balancing as to whether Summit Carbon's proposed project will provide a service that will promote the public convenience and necessity.
> 
> Furthermore, the federal government created this tax credit mechanism to incentivize the capture and sequestration of carbon dioxide, rather than directly funding it, which demonstrates the federal government wants to see results before providing the tax credit. [*citation omitted.*] Tax credits are only realized should Summit Carbon meet the federal requirements of successfully capturing and sequestering carbon dioxide. [*citation omitted.*]. Should Summit Carbon successfully sequester carbon dioxide in conformance with federal law, it is only then that it will be able to realize the 45Q tax credit and pay down its federal tax bill. This simply means the federal government will receive less money in tax revenue from Summit Carbon, and not a direct increase to the national debt. [*citation omitted.*].
> 
> Lastly, while the current 45Q tax credits are only collectible for 12 years, the Board finds this does not impact the Board's decision. The federal government has made a decision about the length of the tax credit, and the Board cannot conjecture as to what the thinking was for the time frame. It is possible the 12 years could be extended, reduced, or modified by the federal government. The federal

government could have also selected the 12-year time frame to allow these types of projects to begin operation before becoming a self-sustaining industry. The only part the Board is considering is the 12-year time frame itself, and the Board finds this to not impact the Board's decision. Overall, the Board finds this factor weighs heavily in favor of granting Summit Carbon's petition for hazardous liquid pipeline permit.

The RLIJ also[10] specify the following text (at page 123, *et seq.*) in the FDO to be in error:

> After reviewing the evidence, the Board finds the factor of climate change is one that will be weighed as part of the Board's overall conclusion as to whether Summit Carbon should be granted a permit. While there is no official policy for the state of Iowa as it relates to climate change, there is a state policy "to reduce atmospheric contamination of this state's environment from the combustion of fossil fuels." Iowa Code § 159A.1(2). Furthermore, there is a greater acceptance and understanding of the impacts anthropogenic carbon dioxide has on the Earth's climate.
> While Sierra Club's testimony on this issue may have been more relevant in other Board dockets, it nonetheless shows there is potential to reduce the amount of carbon dioxide released into the atmosphere. See generally Sierra Club Jacobson Direct. Sierra Club's argument that the Board should deny Summit Carbon its petition so it can construct $5.5 billion in wind and solar generation is not convincing. The Board is not even certain how it could force Summit Carbon to disregard its plans for its proposed project and require the company to construct the wind and solar proposed by Sierra Club. Iowa Code chapter 479B deals with hazardous liquid pipeline permits. There is no language in this chapter that gives the Board the authority to tell a company to not build a hazardous liquid pipeline, but rather build this different piece of infrastructure. While the Board has the ability to deny the permit, there is no guarantee Summit Carbon would take the funds it is proposing to use to construct its proposed hazardous liquid pipeline and instead build the wind and solar proposed by Sierra Club as an alternative.
> Contrary to the assertions of Sierra Club and Rep. Isenhart, there is not a requirement for Summit Carbon to establish that its proposed project establishes a net climate benefit or that its proposed project complies with a least-cost principle. [*citation omitted.*] Therefore, the Board will not consider a least-cost principle, but rather the Board will take a holistic approach to determine whether this factor weighs for or against Summit Carbon's request. The Board also finds perplexing the arguments surrounding the idea that since Summit Carbon is only capturing a small fraction of the total carbon dioxide emissions, the project should be rejected. [*citation omitted.*]. Summit Carbon's proposed project has never been touted as the magical cure of capturing all of the carbon dioxide emission in the world. [*citation omitted.*]. However, the Board agrees with Summit Carbon that reducing emissions will require a number of diverse approaches. [*citation omitted.*]. Diversification is

---

[10] Because the alleged errors in the three areas of FDO text concerning eminent domain analysis is substantially similar, for clarity and brevity the summary of alleged errors is set forth once, at the conclusion of the required text designations.

a principle that the Iowa Legislature is familiar with and supports. See, e.g., Iowa Code § 476.53. Nonetheless, the Board still finds this factor worthy of being considered as part of the balancing test.

As it relates to this factor, the Board finds it weighs in favor of Summit Carbon's petition. While it is beyond the scope of the Board's authority to affirm or deny the existence of climate change, there is sufficient evidence to demonstrate both at the federal and state level there are policies aimed at reducing carbon dioxide emissions that contribute to climate change. See, e.g., 26 U.S.C. § 45Q; Iowa Code § 159A.1(2). The Board finds Summit Carbon's proposed hazardous liquid pipeline will contribute to the reduction in "atmospheric contamination," thus providing an overall benefit to Iowans. Iowa Code § 159A.1(2).

The RLIJ also specify the following text (at page 241, *et seq.*) in the FDO to be in error:

When it comes to climate change, the Board concludes there are sufficient indicators from governments, industries, and consumers that this important issue is unlikely to go away in the near future. While Summit Carbon was cautious to not affirmatively state its proposed project will provide a climate benefit, the Board views the anticipated outcomes of Summit Carbon's proposed project speak for themselves. Summit Carbon is proposing to initially prevent 9.5 million metric tons of carbon dioxide per year from being released into the atmosphere, and eventually increasing to a maximum of 18 million metric tons per year. This is anthropogenic carbon dioxide that occurs outside the natural carbon dioxide cycle. This is the type of carbon dioxide emissions that governments, industries, and consumers are seeking to limit. Summit Carbon's proposed project would provide this benefit to the public by preventing the release of millions of tons of carbon dioxide into the atmosphere annually.

The Board also finds the economic impact provided by Summit Carbon's proposed project to weigh in its favor. While some parties challenged Summit Carbon's assumptions, the Board finds no party provided sufficient evidence to discredit Summit Carbon's conclusion regarding the net positive economic benefit to Iowans. Summit Carbon is estimating $1.9 billion dollars will be spent in Iowa during construction, and each impacted county could receive approximately $1 million per year in additional revenue stemming from Summit Carbon's proposed hazardous liquid pipeline. These are not insignificant sums of money to be spent in Iowa or received by the counties. While Summit Carbon did not include costs in its calculation, the Board struggles to envision a scenario where the cost inputs would usurp the benefits to this project, economically, for Iowa. Overall, the Board finds there is a net economic benefit to the state of Iowa and finds this factor weighs in favor of Summit Carbon's petition.

**Statement of the alleged grounds of error:**

A. Because numerous persons effected by the proposed project were not given adequate notice and a meaningful opportunity to be heard, the proposed use of eminent domain is unlawful due for want of due process predicate.

B. Due to the appearance of partiality of the tribunal[11], the proposed use of eminent domain is unlawful for want of due process predicate.

C. The statute creating the Iowa Utilities Commission was not intended to grant the IUC authority to make determinations as to propriety of the use of eminent domain outside of limited areas historically permitted. Accordingly, any attempt by the IUC to permit the use of eminent domain by an entity proposing construction of a carbon capture sequestration pipeline is void *ab initio* as being *ultra vires*.

D. The unquestioning acceptance of Federal regulatory motivation as being consonant with "public convenience and necessity" is insufficient analysis, as a matter of law, upon which to base a valid justification of use of eminent domain under either Iowa or Federal Constitutions.

E. The lack of analysis of the concept that any articulated Federal policy is an automatic or presumptive justification for use of eminent domain under the Iowa Constitution is contrary to (1) the limited authority granted to the IUC, (2) the requirements of the Iowa Constitution, and (3) the express duties attendant to the stations of the staff and management of the Iowa Utilities Commission.

---

[11] *See, e.g.*, above at 2-4, <u>Caperton</u> *op. cit.,* and its progeny, and, generally, William E. Raftery, *"The Legislature Must Save the Court From Itself"?: Recusal, Separation of Powers, and the Post-Caperton World*, 58 DRAKE L. REV. 765 (2009/2010), and Sarah G. Raaii, *A Penny for Your Votes: Eliminating Corporate Contribution Bans and Promoting Disclosure After Citizens United*, 100 IOWA L. REV. 1357 (2015).

E.  The lack of examination of the highly controversial anthropomorphic carbon-dioxide-induced climate change hypothesis[12] in the FDO precludes any legal basis for justification of the use of eminent domain under the Iowa or Federal Constitutions.

F.  Assuming, arguendo, that the anthropomorphic carbon-dioxide-induced climate change hypothesis were somehow adopted into Iowa law as some type of official public policy dogma or doctrine, any rational evaluation of "public convenience and necessity" would require a detailed assessment of an actual net benefit of a proposed taking, rather than a generalized intention to further such a policy goal.  Embrace of a mere intention of future good works as justifying the exercise eminent domain would gut both the Iowa and Federal Constitutional takings protections and make a mockery of any semblance of due process.

G.  Because precise risks associated with the proposed project have not been disclosed, no person whose property is proposed to be taken by eminent domain has had sufficient notice of the proposed government action.  Accordingly, the proposed use of eminent domain is unlawful for want of due process predicate.

H.  Under the Iowa and Federal Constitutions, use of eminent domain is not permitted for the promotion of private[13] – rather than public – convenience and necessity.  The proposed use

---

[12] Note, in particular, the uncritical use of the word "contamination" with respect to carbon dioxide. *Supra*, pp. 8-9.
[13] *See, esp*., FDO at 125-131, where the analysis quickly becomes almost entirely about "picking winners and losers" among various actors in the Iowa economy. *Cf.* <u>County of Butler v. Wolf</u>, 486 F. Supp. 3d 883, 927 (W.D. Pa. 2020), *rev'd on other grounds*, <u>Cnty. of Butler v. Governor of Pennsylvania</u>, 8 F.4th 226 (3d Cir. 2021). *See also*, Michael Hart, *The Chimera of Industrial Policy: Yesterday, Today and Tomorrow*, 19 Can.-U.S. L.J. 19, 36 (1993) ("Governments do not have a good track record of picking winners and losers, but losers have an excellent record of picking governments.").

of eminent domain in this instance is for private parties to the exclusion of the public. Accordingly, use of eminent domain is not permitted and the attempt to grant eminent domain authority in the FDO is in error.

WHEREFORE, the RLIJ urge the IUC to withdraw the FDO and reconsider its actions in light of the foregoing.

Dated: July 15, 2024                  Respectfully submitted,

<u>By: /s/ Charles M. Thomson</u>
Charles M. Thomson* (AT00010387)
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois